May it please the court, my name is Andrew Schwabe from Charlotte, North Carolina, and I represent the plaintiff appellant Chris Hill in this matter. Your honors, the issue in this matter is whether approximate cause is a jury question, where all relevant parties who read a system of warnings provided by the defendant, Certex, came away with the impression that the warnings advised them to avoid sharp edges while using nylon web slings. The plaintiff testified that it was his understanding that he was required to avoid sharp edges. His co-workers testified that they had the understanding that they were to avoid sharp edges. Tancarva, the plaintiff's employer, their trainer and representative also testified that it was sharp edges that were needed to be avoided. The North Carolina OSHA inspector who testified also said that she was under the impression that sharp edges had to be avoided. And even the Certex sales agent testified that sharp edges had to be avoided. And that's at joint appendix 313 to 314, your honors. The expert, the source of that confusion and what our experts have termed critical confusion came from the warnings as a whole. And even the Certex CEO in this matter testified that the warnings had to be read together as a system. That system was composed of four different pieces. A weight load limit tag that was stitched directly onto the nylon web sling. A warning tag that was also stitched onto the nylon web sling. A safety bulletin that was zip tied to the web sling. And an online product catalog that was also delivered with the nylon web slings to their customers that was an application instructions, it also had the subtitles operator's instructions. Let's think about this. The North Carolina law applies. Negligence. Indeed. Contributory negligence. Yes. So, when you look at this warning label and this safety bulletin, it does indicate some warning there. It tells you you need to use padding on any edges or corners. Mr. Hill didn't do that. Well, that's correct, Your Honor, because he had the impression, he understood those warnings to mean that only sharp edges needed to be avoided. And the impression that he received. Do all those warnings say that? That only sharp edges need to be avoided? Not all of the warnings, of course not, Your Honor. No. Obviously. Any edges or corners. I'm sorry? Any edges or corners. To protect the sling, that's correct, Your Honor. He used padding on any of the edges or corners. He didn't do it. It does say that, Your Honor. And also it's true he didn't do it. He did not do that. Nor did he believe it was necessary, because he felt around... What do you mean with contributory negligence? Whether you believe it's necessary. If there's something that tells you to do something, you fail to do it, the fact that whether you believe it's necessary, how does that... Yeah, I'm with you. I've been dealing with this contributory negligence in North Carolina all the time. I've been in law. Of course, I've been there forever, but North Carolina is one of those states. Right. Unfortunately... So it's clear here, he didn't do that. No, he didn't. Nor did he believe it was necessary, nor did our experts in the industry tell us that he needed to do that if he followed the instructions, because although there is... That's where I'm going. Defensive contributory negligence. I mean, there are some ameliorating conditions. I mean, all of the accidents you have, like last clear chance, all kinds of stuff. Where does the... He didn't believe it's necessary come in as an ameliorating defense to contributory negligence. That's... I'm intrigued with that. That's... If it exists, what's the case law for that? Well, I don't know that there's case law on such a fact-specific matter, Your Honor, but what we have here is a system of warnings, and those warnings need to be interpreted as a whole. Instead of reading in isolation one clause of those warnings, when you look at the warnings as a whole, where you have a warning tag that refers you to some operator's instructions, that... When you look at the operator's instructions, if you just go by the document that is titled operator's instructions, that's an online product catalog. That online product catalog says avoid sharp edges. When we're looking at the whole, and I'm going there, if we were in comparative, we'd be talking a different thing. But it also wanted not to put that choke point against the eye of the sling. That's correct, Your Honor. He ignored that. I would disagree with Your Honor. He did not ignore that. So when you're looking at putting the eye of the sling on the choke point, the way this sling was choked was on the body of the sling. There's always one eye involved. So if you have one hole at the top that's hooked on the clamp, the other eye was not on the other eye of the sling. It was on the body of the sling. And so he had choked it down, and the choke point was on the body of the sling as the manual instructed him to do. And in fact, the weight of those plates was also on the body of the sling. It was the top eye of the sling on the top of the plates that was cut here. But when you look at this thing realistically, it's a tragic situation. I mean, it's horrible to read the facts of what happened here. I mean, we're in North Carolina again. We are. You are in a machine or something, and you are lifting this heavy item up, standing up with this strap, I would call it, best I could say. You walk over there to it, and this thing breaks, and you get injured. It just looks dangerous, even if the straps were working. But here, your question is, you'll say, you didn't warn me of this. But it tells you what you've got to do, and he didn't do it. With all due respect, he did follow what it told him to do. Did it tell him to walk up next to this huge item that could fall on him and trust those straps so it won't fall on you? Well, you're asking two questions. First of all, did it tell him to trust those straps? And it certainly did. It told him that the weight that he had, 700 pounds per plate, 1400 pounds, was going to be within that 2400 pound weight load limit that the strap indicated it would. So he certainly trusted the straps to support the weight. The second question that you raised, though, is, was he in that fall zone? And what he's testified, and what our experts have said, is that he did not do anything wrong, because he did not believe that he was in a fall zone. He was six to eight feet away from these plates as he was raising them up. They were both approximately six feet in height, and as they fell, they pivoted on their corner to now create the situation where he was in the fall zone. So at the time, the way he read those warnings, and the manner in which he read those warnings, were perfectly appropriate according to the warning specifications. And that gets to our larger issue of the implied warranty of merchantability here, Your Honor, because we do believe that he had used the product in accordance with specifications. I want to talk about the specification thing here a little bit. You said Cortex should have warned you about the load limit issue? Right. So we have a separate issue, a separate theory of negligence. That is, the weight load limit classification here was incorrect, because Cortex never warned the plaintiff to avoid putting that, to avoid coming into contact the load with the single ply of the eye, and the fact that that would reduce the weight load limit in half. You made that argument below. We did. We did.  Because what happened here is, there's a single ply of the eye, and then there's the double ply within the body of the sling. And when you apply any pressure or any surface to the single ply of the eye, and the eye can cut because the weight load limit is cut in half, that also was a defect in the warnings Cortex applied. Tell me where you raised that below. Certainly, Your Honor. When you come back. Unfortunately, I don't believe we were allowed to include in our appendix the briefs from the parties, but we certainly raised that issue. I'm just asking you to tell me where it is. I will do so. You do include that in the record, don't you? We do. Thank you, Your Honor. So we have critical confusion here within this warning system from the defendant. Within those four pieces, we have the warning tag that refers to the safety bulletin, even the safety bulletin. In your briefs, you argue that it was Appellee's warning tag advised the user to avoid only sharp edges. Where, where, what warning tag? So it's the... Warned against only sharp edges. Well, so... You cite JA-483, but that's not the correct tag. That's not the tag that was in use when this accident occurred. Right. So we have... So that's right. So where, are there any? Yes. So there is a surtex warning tag that was initially applied to the web sling and had been... That's not the one that was in use when the accident occurred. It was not. So why does that matter? Because... Yet that's the only thing you cite in your briefing for your argument that the tag advised the user to avoid only sharp edges. That's correct, Your Honor. So first of all, I don't believe our brief said that the system said only avoid sharp edges. It said avoid sharp edges. I disagree with the circuit court's characterization of our argument. Avoid only sharp edges. Yeah. So that was certainly our client's understanding, the plaintiff's understanding here, that he had to avoid only sharp edges. Nevertheless... That was attached to this sling? So it was not attached to this sling. The surtex tag had been used for five or six years, actually since 2005, two slings exactly like this. Our plaintiff had read those slings, had read those warnings. Then... The tag that was attached to this sling used the term sharp? It did not. It did not. And so for approximately one... What do that... Pardon? He read something about it being sharp edges. I understand you've been doing something for years and years, but the tag on this one doesn't say that. It says any edges. That's correct, Your Honor. And so what went through that? I'm having some difficulty understanding how that's a failure to warn for that sling. Because even that warning tag, Your Honor, refers the reader back to the safety bulletin, and the safety bulletin refers readers back to their operator's instructions of their catalog. And the catalog... I don't mean to interrupt you, but I'll make sure I understand that. If you have a broader statement insofar as this sling says you are to use it on any edges, it says you can refer back, and it says a more specific thing, sharp edges. Why would the shop control over that? That's on that sling. See, I think it would, Your Honor, and that's what our expert testified. I don't know what you think, but I'd like to have a little bit more than that. I want to have... And I don't mean to not accept, at least she talks on it. I'm trying to understand in terms of the... When you have something on that sling that tells you the warning, but you say, it didn't warn me that this would happen. It's right on the sling, but you said it refers back to a panel that says sharp. But here it says on that sling, any. How do you narrow that? What's on the sling by what's in that panel? Even the CertTech CEO, Your Honor, said that he did not expect all the users to read these warnings every time they used the sling. And that explains why our expert says... You know, that goes to just about any dude that warns. Who reads those warnings? I mean, when you really get down to it, most of it is fine print up there. Who goes up there and actually reads to everyone those warnings? But the law holds you to it when you say you didn't warn me. If you didn't warn me and it's right there and it's in writing on it, the fact that you didn't read it, is that a defense? Well, it's a defense in the sense that our client did read these warnings. He read the warning on the sling. He read the safety bulletin. He read the online product catalog and came away with that. The warning on the sling said all edges. It didn't say only sharp edges. Well, so it said it should be protected from corners and edges. Right. It didn't say sharp. It did not say sharp. And then referred it to the safety bulletin. The safety bulletin referred it to the online product catalog. And he has a five or six year experience using these slings that say warn sharp edges. And so our expert says, in addition to that, if you're going to make a change like that to a product where it's very... to be very dangerous, you have to provide training in addition to a warning like that. I see that my time is now up. Thank you, Your Honor. Let me ask you one question. What if he had on that sling that you have to have a padding on the edges? It says you can refer back to this manual. The manual says you don't need padding. Well, that's part of the critical confusion, Your Honor. We think that results in a question of proximate cause. You don't think that saying on the actual thing you're using is a warning. In other words, that warning is then undone by some pamphlet that says otherwise, even though it's right in front of you as to that specific item. Well, I think you have to put the whole thing into context, because as the defendant's testified, it's a system. So you can't read one thing in isolation and say that you can ignore the rest of it. And in the same way that you can't slip one sling in with one word different and say, all right, ignore six years of history in the way that you've read these. Ignore our product catalog. Ignore everything else that you've read and understood about using these slings for years. So they have to be read as a system. They have to be read together. And they have to be put in context rather than in isolation, Your Honor. Thank you. Thank you. Mr. Shabar? Thank you, Mayor. The court, Judge Gregory, Mr. Shwaba, I'm Luke Shabara. We represent Certex USA. I think the court has hit the nail on the head with respect to many of the issues in this case. As Your Honors know, the issue in this case is whether Judge Catherine Eagles properly granted summary judgment with respect to the three claims below, which were the breach of express warranty claim, the breach of implied warranty of merchantability, and the product liability claim, which arose under North Carolina General Statute 99B. I will very briefly address the breach of express warranty claim. That claim was not briefed in the appellant's opening brief. I believe it's waived under 28, Rule 28. The negligence claim. We spent a lot of time. All right, let's talk about the negligence claim. I believe Judge Thacker and Judge Wynn hit the nail on the head. The safety bulletin that Mr. Hill testified to in his deposition explicitly warned against any edge, not just sharp edges. So did the... Why is the pamphlet saying something different? The pamphlet doesn't say anything different. Where does the sharp edges come from? Okay, the word sharp edges is in the safety bulletin that Mr. Hill testified he read. It says, read and understood. It had no questions about. It says surfaces in contact with the sling do not have to be abrasive or have razor sharp edges to create the conditions for sling failure. Therefore, web slings always must be protected from being cut or damaged by corners, edges, or abrasive surfaces. Now at some point, didn't one of these warnings say sharp edges only? Correct. And so this, I think it was described as a system of warnings. And here we have a number of appellant's co-workers also testifying that they thought the warning only applied to sharp edges. Isn't that some indication of confusion at least and a failure to warn? Well, I think that would be some indication of what the co-workers knew, but that doesn't negate Mr. Hill's specific knowledge. On this particular web sling, we know and there is no contrary evidence in the joint appendix or in the depositions below that there was a warning tag from the WSTDA, which is the Web Sling and Tie Down Association, which Judge Thacker, you addressed, that specifically says that not only sharp edges need to be protected, but all edges need to be protected. And Mr. Hill testified that he read that warning tag beforehand. And we know that warning tag. And which ones, in the deposition testimony, I understand that he said he read and understood the warning. Which one was he reading? Yes. Which one was he shown at the deposition? He was shown an exemplar in the deposition of the web sling. He said, this appears to be the web sling by physical characteristics that I used. It was a three-foot nylon web sling. He could not identify and say it was the exact same one. But we know from the 30B6 deposition of Mr. Evans, who at the time was the CEO of Surtex, that the Web Sling and Tie Down Association warning tag was used. And he knew that because the warning tag was clipped off of the web. Really, that deposition is not a model of clarity as to what he read and understood. Because there were a system of warnings here. And it's not clear what he read. It is clear from his testimony what he understood is that he was only to avoid sharp edges. Well, it's clear that he looked at the warning tag on the web sling that failed. He read the warning tag. And it's clear. There's no contrary evidence that the Web Sling and Tie Down Association warning tag was on the web sling at some point. Mr. Hill reviewed that warning tag, which says nothing about sharp edges. Nor does the safety bulletin, which he read and understands, say anything about sharp edges. It talks about protection. But just to be clear, nobody handed him at the deposition, Here's the warning tag that was on the sling at the time of the accident. Did you read this? And did you understand it? No one did that. Exactly. Because Mr. Hill's employer, during the pendency of his work for compensation case, destroyed the web sling. In November of 2018, the web sling was cut in pieces and put in the garbage. 10 Carver's employer used the web sling, according to their deposition testimony, as a show-and-tell of what not to do in their place of employment. Then, before the lawsuit was filed, one of the employees, one of the managers, I believe the HR manager, cut it in pieces and threw it in the garbage. So it wasn't available, which may present a spoilation issue. But that's neither here nor there. But to answer your specific questions, there's no question at all. There's no evidence to the contrary. And this is why I believe Judge Eagles was correct. That Mr. Hill was on specific knowledge, whether it's a system of warnings, or whether it's an isolated warning limited to the safety bulletin, that he was to protect the web sling under all circumstances. And that there doesn't need to be one specific condition that can give rise to a web sling failure. A sharp edge or any edge can create the condition for failure. And he knew that. He testified he knew that. And he testified that he didn't have any questions about that. And the analogy I draw is sort of like, and the argument that Mr. Schwab is making is, well, there was an obligation. Where was it that he testified he didn't have any question about that? In his deposition. I know, which J, I'm sorry. Sure, I don't know the Joint Appendix site, but I know he testified very clearly in his deposition about that. And Mr. Schwab asked him about that as well. And I asked him, Mr. Hill, is it your contention in this lawsuit that you were not made aware of, is it your contention in this lawsuit that you were not warned about sharp edges as opposed to any edges? Yes, that's his contention. Mr. Schwab asked him the same question. Same thing with their warnings expert or human factors expert, Mr. Maddox. He said this lawsuit arises because of the confusion about sharp edges versus any edges. And the safety bulletin covers all of that. It covers that in the third warning about protecting the sling from damage. What's your response to opposing counsel's point that, I think he said the CEO testified that he didn't expect everybody to read all of the warnings? Well, the CEO, Glenn Evans, testified that sophisticated users use this product. In other words, it's not sold in retail stores. And he also testified that what he expected is users to read the warnings and to understand them before they are used. And that's exactly what happened here. And that's what distinguishes this case from the cases that the plaintiff's counsel has cited. Because, and I'm referring to my notes briefly, but the cases that the plaintiff's counsel cited all have conflicting issues of whether or not the warnings were read or whether they were understood. In the Champ's case, there was a question about the warnings. That was the North Carolina Supreme Court case. The employee had ordered a dust product and the wrong product was delivered. But the correct instructions were applied. In the Bryant case, there's a question about whether the instructions were even provided at all. That's not what happened here. Mr. Hill knew exactly what was happening. And he made a poor decision. We are not our... That's really the question. It's a very tragic situation. Yes. Mr. Hill was not, obviously, doing this sort of thing.  we went back and forth on the padding. It wouldn't matter because of the way that eye was placed directly on it, that that actually cut the weight load in half. I'm just going based on what they're saying. I'm going to ask you to give me the mechanics of it. But Mr. Hill said he didn't put it on that eye. So if he didn't do it, how does... I mean, what does that mean in terms of the mechanics? How does this happen with this kind of equipment if he didn't put it on the eye? The expert said it wouldn't, you know, the padding wouldn't matter. That's a great question, Judge Wynn. There's conflicting versions from each expert about how this happened. And the safety bulletin covers that exact situation. Safety bulletin says that there does not need to be a specific failure mechanism for the sling. That sling failures can occur almost under any circumstances. That there should be padding and not to use the eye. I know you're saying in your situation, according to the appellate's contention, they did not choke on the eye, but we differ. And so did North Carolina Osh about how that occurred. But, you know, that's sort of a, you know, a factual situation. We think that's not material to the outcome. What's material to the outcome, we believe, is that he was warned and that he knew exactly what he was getting into. And again, we're not... Contributory negligence is generally a question for the jury. He was warned to do what? On the safety bulletin, he was warned, and by the warning tag, he was warned that there can be a condition for failure under any circumstances. Not just because of a sharp edge, but any edge. And that slings always need to be protected. And slings can be damaged, abraded, or cut. And compression between the sling... As compression between the sling and the connection point and the load develops. So he was warned about that, and he said he understood it. But as I understand it, the expert said it doesn't matter whether or not you did it or did not in this case, because of where that eye was placed. But Mr. Hill said he didn't put it on that eye. Right. What does that mean in terms of some judgment? Well, yeah, that's another... I mean, that's warned against... Choking on the eye is warned against, and that's another thing that Mr. Hill would have known about and should not have done. And the experts disagree. I mean, our experts said he choked on the eye. I believe North Carolina OSH said, and I understand the appellate's contention that he didn't choke on the eye and he wasn't warned about that. But the warnings, fortunately, cover every single aspect of potential failure. And his employer, Tancarva, said this was a good employee who made a poor decision. Tancarva was fined or cited and then paid fines by North Carolina OSH because of this situation. And Mr. Hill knew. And the argument from appellate's counsel, my friend, Mr. Schwaba, is that Tancarva had this responsibility. And that, to me, turns the notion of Mr. Hill's knowledge on its head. The argument is kind of like saying, well, Surtex had the responsibility to tell Mr. Hill not to drive through a red light. When Mr. Hill already testified, he knew not to drive through a red light. What else can Surtex do when he's testified that he already knew what the safety bulletin meant, that he understood it, that he had no questions about it, that he didn't need it clarified, and he didn't ask his employer about it? Mr. Schwaba has testified today that the reason he knew not to choke on the eye is because he looked at the manual. So he knew not to choke on the eye because he looked at the manual. What does the manual say? The manual says everything that I've just been explaining, which is that there can be a failure mechanism from almost any way in which the sling can be tied to an object. You're saying that insofar as the plain old warrant satisfied to the extent of the padding, it was satisfied in terms of not choking on the eye. Yes. Because the question of whether he did it or not doesn't really go to the warrant. Correct. And, Your Honor, the case is fundamentally different from the Taser case that Mr. Schwaba cited to the court when it biased the first name, I believe it's Fontenot. But the Taser case involved a situation which this court addressed, I believe, in 2013, in which the Charlotte-Mecklenburg Police Department was not advised by Taser that there had been changes to the particular model, Taser, that was being trained for use of officers, and there was a cardiac risk. And Taser failed to warn the CMPD and the police officer of the cardiac risk. The training police officer said he absolutely would have wanted to know that there was a cardiac risk. Unfortunately, someone was tased and died by the specific mechanism at issue in that case. I think it was ventricular fibrillation. And Judge Conrad instructed on failure to warn, product liability against Taser. The jury found against Taser,  because there was a broken chain of events. Taser had failed to warn the police officer whose training didn't have that knowledge, and the individual unfortunately died as a direct result of that. That's not what happened here. Surtex provided knowledge, Mr. Hill read that knowledge and he understood it, but he unfortunately made a bad decision or a poor decision, and he was unfortunately injured. That's completely different from the Taser situation because if the police officer didn't know, Mr. Hill did know and he knew because he read the safety bulletin. And whether he read it alone or whether he read it as a system, I don't think that's material. What's material is what he knew. And his knowledge is what we believe causes this case to crumble because he knew exactly what he was getting into and he knew to protect the sling from damage in any configuration. Your honors, I have not addressed the breach of implied warranty question. We believe that warranty was disclaimed because the warranty language was conspicuous and that is straight out of North Carolina law. North Carolina General Statute 25-1-201 has the definition of conspicuous. And we know that this particular web sling was sold on June 3, 2015 or thereabout from the deposition of Mr. Evans. And it was sold with terms and conditions that included the disclaimer of the implied warranty of merchantability. There's been no contrary evidence in the Joint Appendix whatsoever indicating anything other than there was a disclaimer in all capital letters of the implied warranty of merchantability. We have cited a case, Lee v. R&K Marine, that is in our brief, that is on all fours with this situation in which an implied warranty of merchantability is disclaimed. And that is exactly what we believe here and why this warranty, implied warranty of merchantability was disclaimed. We believe that despite the fact that there was mention of the express warranty above the implied warranty language, that does not change the fact that this disclaimer of warranty was conspicuous. There's no evidence at all from Ten Carva. And they did file a notice of appearance in this case to protect their workers' compensation lien that they had any problem understanding the disclaimer or didn't understand what it meant. The only evidence in this case, which is uncontroverted, would be that it was disclaimed. And as the non-movement, the burden would be on the appellant to come forward with some evidence that this warranty disclaimer was not conspicuous and the non-movement has not done that and the burden has shifted to the non-movement. And the non-movement did not do that. So Judge Eagles, we contend, was correct in that regard. This case also, the facts of this case with respect to the implied warranty also differ from the cases plaintiffs, excuse me, the appellant cited in his reply brief. That's the Griffin Electronic Consultants case and the Raytheon Air case. In those cases, both of those cases, there were significant questions about the manner in which the implied warranty appeared. In the Griffin case, the implied warranty appeared in two different documents and there was an issue of that over whether the service agreement and the quote were one in the same document or two different documents. And the Raytheon Air case, there were multiple documents to consider. So another point with respect to the failure to warn is that this situation is similar to a situation in which an employer would have something like hazardous chemicals or solvents on their property. And Mr. Schwab's contention is, what's the responsibility of the manufacturer to advise and to tell further? Well, there's a lot of problems with that. Number one, the employee is already fully aware of the risk by the employee's own testimony. Number two, there are federal regulatory requirements that exist for TenCarva, Mr. Hill's employer. They were cited and paid those fines to have a web sling program, a preventative maintenance program. And number two and number three, the argument from appellant that CERTEC should have warned further assumes that TenCarva would have accepted that training. It assumes that TenCarva would have paid for that training. It assumes that Mr. Hill would have been part of that training. It assumes that Mr. Hill would have changed the nature of his behavior because of that training. All those assumptions are not in the record. There's no evidence of that. In fact, Mr. Hill was trained in 2009 on web slings. The testimony is he acted contrary to that training. And the testimony from TenCarva is that as a rule of thumb, he should not have used a web sling to move a carbon steel plate. So the argument from the appellant that CERTEC should have done something, again, runs in opposite to the facts of this case because Mr. Hill already knew what he was supposed to do. It was TenCarva's responsibility as a matter of federal regulatory law and OSHA law and state law under North Carolina. And number three, it assumes TenCarva would have done something different and Mr. Hill would have done something different. So in sum, we believe, Your Honors, that the district court did not err and we respectfully request this court to affirm Judge Eagles. Thank you. I just want to make sure I make this. In this record, is it clear that Mr. Hill made the connection? Made the connection? I'm sorry, the physical connection to the strap in terms of let's be connected to the eye. We talked about the single eye. Is it clear that he did that? It is clear he did that. He did all the rigging. He did all the rigging, yes. The experts disagree, Chief Judge Gregory, with respect to the manner in which he rigged the... And the choke. Yeah, the manner of choking and how... But he did it. No one else did it. But that issue is uncontroversial. Thank you. All right. Thank you. Your Honor, what Mr. Sabara indicated just now is correct, that it was Mr. Hill that did all the rigging. However, there are no competing inferences to be drawn between the two experts because their expert was stricken by the trial court at the lower level for not having the proper qualifications to render his opinions. I want to clarify... What does that mean in terms of your expert? How does that help you? It's on the... What your opposing counsel just said is correct, the Judge Berger's question, that he did all of the rigging. Yeah, he said he didn't put it on that eye, but he did all of the rigging. Then you say there's nothing about the expert because his expert said, well, padding wouldn't matter because this eye is the problem. Cut it in half. How's that help? I'm trying to understand. Yeah, because what they said was that he did use the sling so that it was choked on the eye, but he didn't have the qualifications or the background with slings to offer that opinion. And Mr. Mackey... I'm just talking about your expert. Yeah, all right. I'm not stricken. Yeah. Our expert says... Pardon me. Our expert says that he used the sling in a perfectly appropriate manner according to his understanding of it and even according to the warnings because our expert was alerting the industry to the fact that users were using these slings without knowledge that any edge or corner can cut these slings. It doesn't have to be a sharp edge or corner. And that's where, if I can make one point related to Mr. Sabar's representations, our client, the plaintiff, did not have the awareness of the risk, did not have the knowledge, and did not know that that could occur. He understood. He read the warnings. He understood. Your expert said, as I recall, it says it didn't matter. It would have failed regardless of the padding. And it doesn't rely on that. What he's talking about is the choke point, touching that eye. Your client said he didn't do it, he's the only one that did anything to that in terms of the rigging of it. No, I think the question is that he didn't do it, meaning that the choke point was not on the eye, wasn't the two eyes meeting on each other. It was the choke point being choked on the sling body itself. And that was the issue because that is silent in the bulletin and in any of the warnings as to how that's supposed to be choked. That's why our expert did say that the way he choked this was appropriate. That that's the way it was supposed to be done. And he did it. The key being, we're not talking about how he actually did it. We're talking about whether he was wrong about it. And your expert said he did it correctly. Correct. But the warning is what we're talking about. And the warning was inadequate because it didn't tell him that that single-ply eye of the sling could be cut when it's on top of the load that it's carrying. OK, so you have two eyes to the sling and one of those eyes has to be on the body in a choker hitch. And when that eye comes down on top of the load that it's carrying, that's where the cut occurred, not on the supportive end of that eye that's actually bearing the brunt of the load. But on the top of the load, the rest of the sling is positioned above that. So it wasn't choked on the eye because that would be the two eyes being choked together. It wasn't like that. It was choked down lower on the rest of the sling. And so your honor asked me a question to ask or to provide in rebuttal references to the point, references to the manner where in the joint appendix, where we had made that argument to the lower court and the references are JA-1017, JA-928 to 931, and JA-948 to 951, as well as JA-1057 to JA-1068, where our expert, Mr. Mackey, testified in that regard. And so Mr. Sabara and I think the defense and the lower court took a, what I would say a leap of rationality here where they take the fact that our client understood these warnings to mean that he was actually aware of the risks. The problem here is that the defense and we would suggest the lower court never asked what he understood those warnings to mean, because when you asked him what he understood those warnings to mean, he understood them to mean that it was sharp edges only. Now, your honor asked, did the safety bulletin talk about sharp edges? And I mistakenly said that it did not, but in actuality, when you read that bulletin, it does say that warnings do not have to be razor sharp. And I think when you put that into context with the warning tag that says avoid sharp edges, with the operator's instructions that it says avoid sharp edges, it's very reasonable and all inferences should be drawn to the non-moving party that sharp edges were the ones to be avoided. That's historically what Mr. Mackey testified to, that users had been under this misimpression. And that's why the North Carolina ocean inspector had the same misimpression. And the defendant's sales agent, Mr. West, had the same misimpression that it was only sharp edges that had to be avoided. I see him over my top head. Counselor, do you have any case, contributory negligence, Virginia is a pure contributory negligence state too, so I'm used to how it works, but are you saying, do you have any case that says, this is hypothetical, really counterfactual, really, since if you've been doing something a certain way a thousand times over 10 years, tried and proven to be worse, but somewhere in there in a manual, it says you're supposed to use an over looping hitch rather than a closed knot. And then it falls and then you say, wait a minute, I understood, but I understood because I've been doing this for 10 years and I always do it that way. Are you saying that you can avoid contributory negligence because of that usage and experience, notwithstanding that somewhere in a manual, somewhere it says you should have tied it this way. So do you have any case like that? Because I think it's kind of intriguing. That's kind of what this case kind of comes down to. Yeah, I think first of all, the trial court never reached the issue of contributory negligence and we certainly don't think there can be contributory negligence where everyone else had the exact same understanding as the plaintiff in this matter. But to the court's question, I do not have a specific case on the same grounds as the court would suggest. What we would suggest to the court is that Fontenot case is very similar where all parties were under the impression that being hit with a taser in the chest could not cause cardiac implications. And that was the understanding in the industry for years that is what taser had advised users for years until taser learned shortly before the incident, the unfortunate incident, that cardiac implications could occur. And we have the same situation in this matter. The industry was unaware that any cut or edge, or pardon me, any corner or edge could cut these slings until Mr. Mackey's article in 2009 began the conversation and began other manufacturers updating their warnings and providing training to companies so that that pitfall could be avoided, except for Surtex. When what Mr. Mackey's, pardon me, what Mr. Mackey's opinions and his report show is that Surtex was behind the industry, didn't pay attention to industry warnings and standards, took no efforts to keep apprised of his developments and the industry's actions in this regard. And so all of the industry knew and should have known by Mr. Mackey's article and by the developments within WSTDA that it was something more than sharp edges that could cut these slings. But Surtex didn't take any measures to educate and to warn their users and customers. They're putting it on the sling itself. Well, again, they did put it on the sling itself for a brief period  but should be used or interpreted in the context of the remaining warnings. Thank you. But your expert did say it wouldn't have made any difference how you actually padded the edges, right? That's correct. And that's because you have to educate and warn users on the specific types of cut protection to- And I'm not talking about warning, I'm talking about causation now. Right. You said that it didn't matter in terms of causation, but however you, I guess, covered or matted, the protective edges is sharp or otherwise because of the actual rigging itself was the problem. Is that right? Your expert, just tell me your expert. Yeah, with regard to our expert, he doesn't say the rigging is a problem. He does say that the cut would have occurred even if the sling had been protected. So it would have cut right through that cut protection. If you put a blanket on it, if you would have put industry certified cut protection, it would have cut right through that cut protection as well. Just because of the weight? Because of the weight and because of the manner in which it was, well, because, generally because of the weight, yes. Thank you, Your Honor. Thank you. All right, counsel, both of you, thank you so much for your arguments and helping the court on these cases. And we appreciate it very much. Thank you.
judges: Roger L. Gregory, James Andrew Wynn, Stephanie D. Thacker